[No. 17286. *En Banc.* July 7, 1922.]

JOHN P. DUKE, *as Supervisor of Banking, Respondent,*
v. HORTON CAUMONT FORCE, *Appellant.*[1]

BANKS AND BANKING (1, 3)—STOCKHOLDER'S LIABILITY—ASSESS-
MENT OF STOCK. Under Const., Art. 12, § 1, reserving to the legis-
lature the power to alter all laws relating to corporations doing
business in the state, which business may be regulated, limited or
restrained, the legislature may provide for the maintenance of the
capital stock of a bank, by the levy of an assessment on the stock-
holders, as provided by Rem. Comp. Stat., § 3267, which is in addi-
tion to the superadded liability provided by Const., Art. 12, § 11;
since that attaches only on liquidation and is not made a sole and
exclusive liability.

SAME (1, 3). Rem. Comp. Stat., § 3267, authorizing the state
banking department "to notify" a bank to levy an assessment upon
the stockholders for the replacement of impaired capital and sur-
plus, without expressly compelling the stockholders to make such
assessment, should they prefer liquidation, leaves it optional with
the stockholders to make the assessment or to go into liquidation.

SAME (1, 3). Rem. Comp. Stat., § 3267, granting to the state
banking department the power to notify the stockholders of a bank
to levy an assessment for the replacement of impaired capital and
surplus, controls, so far as it is inconsistent with Id., § 3241, pro-
viding merely for the exercise of such power; and the right to make
the assessment rests with the stockholders, and not the bank or the
state banking department.

SAME (1, 3). Stockholders in a bank who were illegally assessed,
on notice from the state banking department, for the replacement of
impaired capital and surplus and to prevent liquidation, and who
paid their assessments, are estopped to off-set the illegal payments
against their superadded liability, or to assert their claims as gen-
eral creditors though the payments may be assumed to have been
under a business compulsion and involuntary, where nothing was
done for over one year, during which additional liabilities were in-
curred, materially affecting the status of the business of the bank
and of new and old creditors.

Appeal from a judgment of the superior court for
King county, Ronald, J., entered January 5, 1922, in

[1] Reported in 208 Pac. 67.

favor of the plaintiff, upon sustaining a demurrer to the answer, in an action to enforce the superadded liability of a stockholder of an insolvent bank. Affirmed.

*Fred H. Peterson* and *H. C. Force,* for appellant.
*W. V. Tanner* and *John P. Garvin,* for respondent.

MACKINTOSH, J.—The case under the above title and the cases of *Duke v. Mines, post* p. 624, 208 Pac. 75; *Burke v. Duke, post* p. 695, 208 Pac. 77, and *Duke v. Burke, post* p. 694, 208 Pac. 77, all relate to the same subject, and the issues involved are so interwoven that it seems advisable to discuss the entire situation in one opinion; therefore, various positions and arguments made by different counsel in these cases will be here considered, though all these questions were not raised and argued in any particular one of the cases. Where a case presents issues not common to all it will be considered in a separate opinion.

The appellant in this case has been a stockholder since 1907 in the Scandinavian-American Bank, a failed institution. In the year 1920, he paid a one-hundred per cent assessment upon his stock, and upon the taking over of the bank on July 1, 1921, by the respondent for the purpose of liquidation, he was called on to pay the superadded liability imposed by § 11, art. 12, of the state constitution, and § 35, p. 290, ch. 80, Laws of 1917 (Rem. Comp. Stat., 3242). He refusing to pay this final assessment, this action was brought for the purpose of collecting it. He defended on the ground that he had already paid the superadded liability by the payment in 1920. A demurrer was sustained to this defense and he has appealed.

As was said in the beginning of this opinion, we will not confine ourselves to the argument advanced in the

instant case, but will consider all the arguments presented in the different cases, which are advanced to the common purpose of preventing the collection of this final assessment.

It will be well to first set forth the constitutional and statutory provisions which have any bearing upon the questions at issue:

Section 1, art. 12, of the constitution reads:

"Corporations may be formed under general laws, but shall not be created by special acts. All laws relating to corporations may be altered, amended, or repealed by the legislature at any time, and all corporations doing business in this state may, as to such business, be regulated, limited, or restrained by law."

Section 4 of the same article provides:

"Each stockholder in all incorporated companies, except corporations organized for banking or insurance purposes, shall be liable for the debts of the corporation to the amount of his unpaid stock, and no more, and one or more stockholders may be joined as parties defendant in suits to recover upon this liability."

Section 11 of the same article is:

"No corporation, association, or individual shall issue or put in circulation as money anything but the lawful money of the United States. Each stockholder of any banking or insurance corporation or joint stock association shall be individually and personally liable equally and ratably, and not one for another, for all contracts, debts, and engagements of such corporation or association accruing while they remain such stockholders, to the extent of the amount of their stock therein at the par value thereof, in addition to the amount invested in such shares."

Section 35 of the banking act, being § 35, p. 290, ch. 80, Laws of 1917, which puts the constitutional provision last quoted into statutory form, reads:

"The stockholders of every bank and trust company shall be individually and personally liable, equably and ratably, and not one for another, for all contracts, debts and engagements of such corporation accruing while they remain as stockholders, to the extent of the amount of their stock therein at the par value thereof, in addition to the amount invested in such shares. Persons holding stock as executors, administrators, guardians or trustees, if such relation of trust shall appear in the stock certificate and on the books of the corporation, or as collateral security or in pledge, shall not be personally liable as stockholders, but the assets and funds in the hands of such trustees constituting the trust shall be liable to the same extent as the testator, intestate, ward, or person interested in such funds would be, if living or competent to act, and the person pledging such stock shall be deemed a stockholder and liable under this section. Such liability may be enforced by the examiner as soon after taking possession of any bank or trust company as in his judgment the same may be necessary. The failure of the stockholders of any bank or trust company immediately upon possession being taken by the examiner to make good all impairment of its assets shall be conclusive evidence that the enforcement of double liability is necessary." Rem. Comp. Stat., § 3242.

Section 60, p. 301, of the same chapter is as follows:

"Whenever it shall in any manner appear to the state bank examiner that any offense or delinquency referred to in the preceding section renders a bank or trust company in an unsound or unsafe condition to continue its business or that its capital or surplus is reduced or impaired below the amount required by its articles of incorporation or by this act, or that it has suspended payment of its obligations or is insolvent, said examiner may notify such bank or trust company to levy an assessment on its stock or otherwise to make good such impairment or offense or other delinquency within such time and in such manner as he may specify or if he deem necessary he may take possession thereof without notice." Rem. Comp. Stat., 3267.

Section 34, p. 288, of the same banking act reads:

"Whenever the state bank examiner shall notify the board of directors of a bank or trust company to require the payment of an installment or to levy an assessment upon the stock of such corporation, such board shall within ten days from the issuance of such notice adopt a resolution for the collection of such installment or the levy of such assessment and shall immediately upon the adoption of such resolutions serve notice· upon each stockholder personally or by mail at his last known address to pay such installment or assessment and that if the same be not paid within twenty days from the date of the issuance of such notice, his stock shall be subject to sale, and all amounts previously paid thereon will be subject to forfeiture. At any time after the expiration of said twenty-day period, the board may proceed by action at law or otherwise to collect the installment or assessment from any delinquent stockholder, or it may, whether any action has been commenced or not, at any time before the installment or assessment is actually paid, sell the stock of such stockholder and forfeit all amounts previously paid thereon. At any time after the expiration of sixty days from the expiration of said twenty-day period, the examiner may require any stock upon which the installment or assessment remains unpaid to be cancelled and deducted from the capital of the corporation. If such cancellation shall reduce the capital of the corporation below the minimum required by this act, or its articles of incorporation, the capital shall, within.thirty days thereafter, be. increased to the required amount by original subscription, in default of which the examiner may take possession of such corporation in the manner provided by law in case of insolvency.

"If any stock be sold prior to cancellation, there shall be returned to the original stockholder, his heirs or assigns, any surplus which remains after deducting from the amount realized at such sale, the amount of the installment or assessment due upon such stock, together with all costs incurred in connection with the sale of such stock, and interest upon the installment or

assessment from the date of the notice to the stockholder. In the event of the failure of any board of directors to adopt the resolution herein required within the time specified, or to collect any installment or assessment, or to forfeit the stock of any delinquent stockholder, as herein provided, the examiner may, himself, in his discretion, at any time, issue the notice herein provided for on behalf of such corporation, and bring any appropriate action in his own name, but for the benefit of such corporation, for the collection of any installment or assessment, declare the forfeiture of any stock, or perform any other act herein referred to with the same force and effect as if such act were performed by the board of directors, and in the event that the examiner shall have brought any proceeding for the collection of any installment or assessment, the board of directors shall thereafter have no power to cancel the stock involved or continue such proceeding, except as permitted by said examiner.'' Rem. Comp. Stat., § 3241.

On January 17, 1920, the state banking department sent the following letter to the board of directors of the Scandinavian-American Bank:

''STATE OF WASHINGTON

''Banking Department

''Olympia

''Board of Directors,                    January 17, 1920.

''Scandinavian-American Bank,

''Seattle, Washington.

''Gentlemen: The last examination of your bank made by representatives of this department disclosed the fact that a large number of the assets being carried on the books of the bank are either worthless or of such questionable value as to justify this office in requiring you to charge them off.

''According to a recent report received in this office, you have already utilized $163,912.01 of your undivided profits for the purpose of eliminating certain of these items. To charge off the remaining objectionable assets will require the application to that purpose of additional funds amounting to approximately $1,300,-

000.00. This would exhaust your present surplus of $500,000 and impair your capital to the extent of $800,000.00.

"In order to maintain your capital at the amount required by your articles of incorporation and maintain a surplus account of at least $200,000.00 which is considered necessary to provide proper protection to your depositors, it is considered expedient by this department that an assessment be levied upon your capital stock for that purpose.

"You are therefore instructed to levy upon and collect from your stockholders an assessment of 100% of the par value of the stock and use the proceeds of such assessment in eliminating the objectionable assets now carried by the bank.

"For the provisions of the law governing the levy of assessments on the capital stock of banks and providing the procedure to be followed in collecting assessments levied, I refer you to section 34, ch. 80, Session Laws 1917. (Section 46, Compilation of Banking and Trust Company Laws.) In brief, the law requires that you, the board of directors of the bank, adopt a resolution providing for the levy of this assessment within ten (10) days from the date of this letter, which is your notice from this office. Immediately upon the adoption of the necessary resolution you shall cause to be served, upon each stockholder personally or by mail at his last known address, a notice to pay this assessment within twenty (20) days of the date of such notice. The notice to your stockholders must relate that if the assessment is not paid in full within the twenty (20) days allowed, his stock will be subject to sale, and all amounts previously paid thereon will be subject to forfeiture.

"Permit me to suggest that in order that your stockholders may be fully advised of their position and on proper notice so that they may protect their interests, that you inclose with or make a part of the notice to your stockholders, a complete copy of the section of the law governing the levy and collection of assessments hereinbefore referred to.

"It is requested that when the proceeds of this assessment have been collected, you prepare a list of the most objectionable assets which in your judgment should be charged off at this time, and submit the list to this office. You will at that time receive instructions from this department relative to the manner in which the funds are to be applied.

"You are requested to report to this office the collection of the assessment on your capital stock promptly after the expiration of the period allowed by law.          Yours very truly,
          "(Signed) Louis H. Moore,
                    "Bank Commissioner."

In compliance with the requirements of this letter, the board of directors of the Scandinavian-American Bank adopted the required resolution and notified the stockholders, who paid the assessment therein provided for.

Under the constitution, the liability of stockholders in banking corporations is not confined to the amount of their stock subscriptions. There is added a constitutional liability upon them to the extent of the par value of their stock, in addition to the amount invested by them in such stock, to be paid equally and ratably upon the contracts, debts and engagements of the bank. This provision for superadded liability is not made by the constitution of this state (as it is by the constitutions of some states) a sole and exclusive added liability of bank stockholders. This superadded liability is one which attaches only upon the liquidation of the bank, and § 1, art. 12, of the constitution, allows the legislature to provide for the maintenance of the capital of the bank unimpaired, and to pass statutes looking to the replacement of impaired capital by the stockholders, or in the event that they see fit not to make this replacement, to put the bank into liquidation. This reserve power to amend the laws relating

to corporate franchises has been uniformly sustained by the courts. *Pennsylvania College Cases,* 80 U. S. (Wall.) 190. In *Looker v. Maynard,* 179 U. S. 46, 21 S. Ct. 21, the supreme court of the United States said:

"The effect of such a provision, whether contained in an original act of incorporation, or in a constitution or general law subject to which a charter is accepted, is, at the least, to reserve to the legislature the power to make any alteration or amendment of a charter subject to it, which will not defeat or substantially impair the object of the grant, or any right vested under the grant, and which the legislature may deem necessary to carry into effect the purpose of the grant, or to protect the rights of the public or of the corporation, its stockholders or creditors, or to promote the due administration of its affairs."

In *Sherman v. Smith,* 66 U. S. (1 Black) 587, 17 L. Ed. 163, it was held that the legislature exercised properly its power to alter or amend corporate charters by authorizing additional stock liability, though at the time the bank was organized the law specifically provided that the stockholders should not be liable for its debts.

In *Barth v. Pock,* 51 Mont. 418, 155 Pac. 282, it was held: .

"The authority of the legislature under such reserved power to increase the burden of liability imposed upon stockholders in a banking corporation, or to impose a personal liability for the debts of the company thereafter to be contracted, where none was imposed at the date of the company's organization, has been recognized and asserted by many of the authorities."

In *Williams v. Nall,* 108 Ky. 21, 55 S. W. 706, it was declared that:

"The stockholders formed the corporation on the conditions held out by the laws of the State. One of these conditions was that the act under which they were

created might be amended or altered by the Legislature at pleasure, as it might deem necessary. The Legislature might, in the first place, have provided that the stockholders should be liable for the corporate debts; and when it provided that they should not be so liable, but reserved the right to alter or amend the law, or to repeal any grant or franchise obtained under it, those who had acted under the statute with full notice of these facts can not complain that any constitutional right of theirs is violated by the alteration of the law.''

*Bank of Blytheville v. State,* 148 Ark. 504, 230 S. W. 550, holds:

''An acceptance of the altered charter was clearly made by continuation in business after the change was made. The statute in question is not void as infringing upon either the Constitution of the state or of the United States.''

See, also, Fletcher, Cyclopedia Corporations, § 4146, p. 7164; *Davis v. Moore,* 130 Ark. 128, 197 S. W. 295; *Bissell v. Heath,* 98 Mich. 472, 57 N. W. 585.

The case of *First Nat. Bank v. Multnomah State Bank,* 87 Ore. 423, 170 Pac. 534, is cited as an authority contrary to the position just maintained. The following quotation from that case shows the distinction between the situation obtaining in Oregon and the one obtaining in Washington:

''It is contended by plaintiff's counsel that when the defendant bank was incorporated and also when Rostad subscribed, paid the full par value thereof and received his certificate of stock, Article XI, Section 3, of the Constitution was as follows:

'' 'The stockholders of all corporations and joint stock companies shall be liable for the indebtedness of said corporation to the amount of their stock subscribed and unpaid, and no more.'

''That there then existed no reserve power whereby the articles of incorporation of any such artificial be-

ing or company could be altered, amended or repealed so as to increase the liability of a stockholder in excess of the sum so limited; that the clause of the organic law quoted made the charter of the defendant bank a contract between it and its stockholders, and between the latter and the state, thereby authorizing the holders of corporate stock to invoke and rely upon Article I of Section 21 of the fundamental law of Oregon, which so far as material herein, reads: 'No . . . law impairing the obligations of contracts, shall ever be passed'; that a subsequent amendment was made to Article XI, Section 3, of the Organic Act, by adding to it this language:

" 'Excepting that the stockholders of corporations or joint stock companies conducting the business of banking shall be individually liable equally and ratably and not one for another, for the benefit of the depositors of said bank, to the amount of their stock, at the par value thereof, in addition to the par value of such shares': Laws Ore. 1913, p. 8.

"That no retroactive force was imparted by the amendment to the original clause of the Constitution, whereby any authority was granted to assess shares of stock which had been subscribed for, the par value thereof paid in full, and the certificates delivered prior to November 29, 1912, when the amendment went into effect; and that the attempt to impose upon the stock so held by the plaintiff an additional burden was violative of the Constitution of the United States and of the State of Oregon and void, and hence errors were committed in dismissing this suit and in not granting the relief prayed for in the complaint."

These contentions were sustained and that case, therefore, can be of no authority here, where the constitutional provisions are so different, and where § 11, of art. 12, does not make the superadded liability the only liability which may be imposed upon bank stock. It was in the exercise of this authority which the legislature possessed that §§ 34 and 60 of the banking act

(Laws of 1917, pp. 288, 301), were passed. It has been held that the superadded liability obligation is not discharged by the act of the stockholders in replacing impaired capital. *Delano v. Butler,* 118 U. S. 634, 7 S. Ct. 39. *Blackert v. Lankford,* 176 Pac. (Okl.) 532, held:

"It is further shown that in December, 1910, several months before the bank in question was declared insolvent, an assessment of 60 per cent. was levied on the·stock of the bank in order to repair the capital stock thereof, and that the plaintiff in error paid a 60 per cent. assessment upon his stock, and contends here that he should be allowed a credit upon the amount sought to be recovered in this action by the payment then made by him.

"Section 288, Rev. Laws 1910, provides in substance that, whenever it appears that the capital stock of any bank doing business in the state of Oklahoma shall have become impaired, the bank commissioner shall notify such bank to make such impairment good within 60 days, and that it shall be the duty of the officers and directors of a bank receiving such notice from the bank commissioner to immediately call a special meeting of the stockholders for the purpose of levying the assessment sufficient to cover the impairment of the capital stock of said bank. The purpose of the assessment was not to benefit creditors, because the bank was then a going concern; but it was only for the purpose of repairing the impaired capital stock of the bank, and was a benefit to the corporation and to the stockholders only. The creditors of the bank had no right to participate in the proceeds of this assessment. ·This provision of the statute does not impose any personal liability on the stockholders, nor does it create any right to enforce it but in the bank itself, and the right of the bank is not against the stockholders, but against the stock itself. If the assessment is not paid within the time fixed by the statute, the stock will be sold; but, if the stockholder does not wish to lose the stock, he can retain it by paying the assessment. This is not the double liability imposed by section 265, but is

in the nature of a reinvestment in this stock to the amount of the assessment."

In *Northwestern Trust Co. v. Bradbury,* 117 Minn. 83, 134 N. W. 513, Ann. Cas. 1913D 69, it is stated:

"Nor can it be held that the payment of the assessment made pursuant to the order of the public examiner operated as a discharge of the liability. This order was issued under and pursuant to the authority conferred by provisions of section 3000, R. L. 1905, which provides, in substance and effect, that whenever the capital of a banking corporation shall become impaired the officers thereof shall, within ninety days after receiving notice from the public examiner, make up the deficiency by a pro rata assessment on the capital stock, or go into liquidation. Section 3002 further provides that if any stockholder shall refuse to pay the assessment so ordered his stock may be sold in the manner directed.

"Previous to the order by the public examiner his investigation into the affairs of the bank brought to light a material impairment of the bank's capital, and a compliance with the order for the assessment was a condition upon which the bank might reopen its doors and resume business. It was not a proceeding in the interest of creditors, but rather to place the bank in position for the future transaction of business. And whether the payment thus required to be made was voluntary or involuntary, it served its primary purpose, and on the funds thus acquired the bank was able to reopen its doors.

"The contention of the defendant that, to construe this statute as not a compulsory proceeding resulting, upon the payment of an assessment made thereunder, in the discharge of the constitutional liability of the stockholder, would render it invalid as in violation of constitutional rights, is not sound.

"The business of banking so materially and vitally affects the general public interests as to make it a proper subject for complete legislative regulation and control. The sole purpose of this statute was to vest in the public examiner supervisory control over such

institutions, and by timely action to prevent the impairment of their funds, to the injury and loss of depositors and others, and to keep and maintain them so far as practicable upon a safe and sound financial basis. That the power to so provide is within legislative discretion we have no doubt . . . The proceedings of the examiner were not in the interests of creditors, but to enable the bank to continue its business; and, though the funds thus acquired were applied to the payment of creditors, it must be held, unless we are to open the door leading to a defeat of the purposes of the Constitution in creating the liability, that the payment of the public examiner's assessment did not operate to discharge the liability.''

We take it there could be no question in the cases before us that the stockholders would be liable on the assessment made by the respondent, as liquidator, for the superadded liability were it perfectly clear that the legislature had provided for assessments upon the stock for the purpose of making good depleted capital, and that those assessments had been voluntarily paid by the stockholders, who had the option either of so assessing themselves or allowing the bank to cease business and go into liquidation. The attack, therefore, is upon §§ 34 and 60, above, one of the principal grounds being that they do not provide for the stockholders taking action themselves and exercising a choice as to whether they will submit their stock to additional assessments or close the bank.

Section 60, p. 301, is the section which gives the power to the banking department, under § 1, of art. 12, of the constitution, to compel banks to maintain their capital or surplus unimpaired, and by its terms the examiner may notify such bank to levy an assessment on its stock to make good such impairment. The section empowers the banking department to call upon the stockholders to levy an assessment to make good

the impairment, but does not compel the stockholders to make such assessments if they should determine that they prefer to cease operation, and when they, of course, would be liable only for the superadded liability. *Delano v. Butler, Blackert v. Lankford,* and *Northwestern Trust Co. v. Bradbury, supra; Devney v. Harriet State Bank of Minneapolis,* 145 Minn. 339, 177 N. W. 460; *Commercial Nat. Bank v. Weinhard,* 192 U. S. 243, 24 S. Ct. 253. The last cited case states the following:

"The assessment in this case was made by the board of directors without any action of the stockholders of the association, and the defendants in error having failed to pay the same upon notice, their stock was sold as directed in the statute. It is claimed that an assessment by the directors without action of the stockholders was without authority of law and amounted to a conversion of the stock. This view was sustained in the Supreme Court of Oregon. The assessment ordered by the Comptroller was for the purpose of restoring the capital of the bank, and thus enabling it to continue its business. Ample power is conferred upon the Comptroller for this purpose. His action is in aid of other sections of the law preventing a withdrawal of the capital, or the making of dividends when losses have been sustained equal to the undivided profits. Sections 5202-5204, Rev. Stat. When the notice is received from the Comptroller by the bank under section 5205, the association has no authority to review or gainsay the necessity thereof. That question is concluded by the action of the Comptroller. The money to be raised for the continuance of the business may or may not be used in the liquidation of debts. The assessment is entirely different from that provided for in section 5151, calling upon the individual responsibility of shareholders for the payment of debts. Under the last named section the stockholder is required to pay such assessments as may be made, to meet the outstanding obligations of the bank, within the limit of an amount equal to the par value of the

stock in addition to the amount invested therein. He has no election of payment, but is required to meet this liability, created by law for the benefit of creditors. Under section 5205 the amount paid is subject to the control of the board of directors in the continued operations of the bank. If the stockholders are to have a voice in making or declining to make the assessment, they may well hesitate to entrust more capital to the control of a board under whose management it has already been impaired. Certain powers are conferred by law upon the directors. . . . The directors are given authority to transact the usual and ordinary business of national banks. Obviously, the power conferred may be exercised in all usual transactions through the executive officers of the bank without consultation with the stockholders. In the present case the question to be dealt with is vital to the continuance of the life of the association, as only by complying with the requirement of the Comptroller in assessing a sum sufficient to make up the impaired capital of the bank can its business be continued. The shareholders by their contracts of subscription have agreed to pay in the amount of capital stock subscribed and to discharge the additional liability imposed by the statute. They have not contracted to meet assessments at the will of the directors to perpetuate the business of a possibly losing concern. It would be going far beyond the usual powers conferred upon directors to permit them thus to control the corporation. Corporate powers conferred upon a board of directors usually refer to the ordinary business transactions of the corporation. *Railway Company v. Allerton,* 18 Wall. 233. The assessment is required by the Comptroller, not by the directors. The association is to receive notice thereof, and action must be taken by the association to meet the requirements of the Comptroller under the statute. It is provided that if the association fail to pay up its capital stock, and refuse to go into liquidation, as provided by law, for three months after receiving notice from the Comptroller, a receiver may be appointed to close up the business of the association according to the provisions of section 5234. This

important provision is entitled to much weight in determining the proper construction of the statute. The assessment may be avoided, and the amount required is not payable if the association decides to go into liquidation. . . .

"We are of the opinion that section 5205 is intended to and does confer upon the association the privilege of declining to make the assessment to make good the deficiency to the capital, and to elect instead to wind up the business of the bank under section 5220, which provides for voluntary liquidation by a vote of two-thirds of the shareholders. The question is, who shall exercise this privilege and determine the future of the association—is it the directors or the shareholders who have this right of decision? The origin and continuation of the association would seem to be matters in which the owners and not the managers of the bank are primarily interested. If these are privileges of the shareholders and only exercisable by them, this case presents a total lack of the exertion of the power by those upon whom it is legally conferred, as no action of the shareholders was had in the present case in making the assessment. Action upon the Comptroller's order involves extraordinary action of the association, and determines its future operations or liquidation, and is not found within the powers conferred upon the directors for the management of the business of the bank. If this were not so, then the decision of a question of such vital importance is left to the directors, who may or may not be large holders of stock. As it is a matter foreign to the powers of such boards and not conferred by statute or required for the transaction of the business of the bank, we think it was intended to be vested in the shareholders. Whether a given power is to be exercised by the directors or the shareholders depends upon its nature and the terms of the enabling act. . . .

"In section 5205 the requirement of the Comptroller is that the association make the assessment. It is the 'association' which is required to pay up the stock or go into liquidation. The payment of the assessments

must come from the shareholders, and we are of the opinion that the statute contemplates action upon the alternatives presented in the statute by the association composed of its shareholders. It is true, as suggested by the learned counsel for the plaintiff in error, that it requires a two-thirds vote of the stockholders to put the bank into liquidation under section 5220; but if the assessment is not carried, and the shareholders have not a two-thirds vote favoring liquidation, the bank is put in liquidation, and the shareholders' liability is the statutory one for the benefit of creditors, and not a venture of more capital in the enterprise with a possible stockholders' liability upon the liquidation of the bank if it shall ultimately fail. Again, if the determination of this matter is entirely left to the directors, they may, by declining to make the assessment, force a liquidation of the bank, although the shareholders — the real owners of the property — be willing to make good the impaired capital and continue the business. On the other hand, if the directors may assess to make good impaired capital, the shareholder must pay the assessment or submit to the sale of his stock. Such extraordinary powers are far beyond those required in the management of the bank's affairs or conferred in the sections of the law defining those conferred upon the directors. . . . The assessment under section 5202 provides for a sum to continue the operations of the bank and if unpaid subjects the stock of the shareholders to sale to make good the deficiency in its collection. Shareholders are given the right to go into liquidation, subjecting themselves, it is true, to the liability of the assessment for the benefit of creditors under section 5151 to an amount equal to the par value of their stock, if needed to make good the indebtedness of the bank, but risking no further investment of new capital in the continued business of the bank. The choice of methods is with the shareholders, and to them is addressed the decision of the question and the making of the assessment if that course is determined upon. *Hulitt v. Bell*, 85 Fed. Rep. 98. In the present case the assessment was made by

the directors without action by the shareholders, and, not being within the·statute, was void."

Whether the legislature might have the power or not may be a question, but it certainly did not by this act say that banks must continue to operate at the order of the banking department and continue to make assessment upon stockholders to replace impaired capital or surplus, when the stockholders themselves (and when we refer to stockholders we mean the majority of the stockholders) prefer to liquidate the bank and subject themselves only to the superadded liability. Section 60 (Laws of 1917, p. 301), does not give the power to the banking department itself to levy an assessment or to order the board of directors to do so, and this being so, it is not necessary to discuss the question as to whether such power could have been granted by the legislature. As was said in the case just cited, the provisions of the statute empowering the banking department "to notify such bank" means that the notification is to the *stockholders,* who must act in the premises.

Section 60 we may call the power section, and § 34, p. 288, is the machinery section which was intended to provide the procedure by which the banking department should make use of the power furnished in § 60. This more clearly appears when these sections are compared with the Federal statute in relation to national banks, and which is the genesis of our act. Section 5205, Rev. Stat. U. S. In the Federal statute the subject-matter of our §§ 34 and 60 is contained in one section, and that portion covered by § 60 precedes that covered by § 34, and confirms our belief that § 34 was intended only to present the method of executing the authority given by § 60. But § 34 is inconsistent with § 60, and being the section providing merely for

the exercise of the power granted by § 60 must give way where inconsistent. No power was given the banking department either to authorize the board of directors to arbitrarily levy an assessment upon the stockholders, who must either pay or subject the stock to forfeiture, nor does it give that power to the banking department. As a matter of fact, in the instant cases the assessment, although in form made by the board of directors, was an assessment levied by the banking department. Waiving the question whether such a thing might be accomplished directly by the legislature attempting to authorize it, no such power exists in § 60, which is the one under which the banking department must act. Had § 34 followed the authority created by § 60, it would provide that, after the banking department had notified the bank (stockholders) to make good the impairment, the stockholders should proceed either to make the necessary assessment or put the bank into liquidation, and if the assessment were made, the method of enforcing its collection, etc., is provided for in the section. It follows, therefore, that the argument of counsel for the stockholders, directed against § 34, that it is invalid in so far as we are here considering it must be sustained, and that the assessment of 1920 was invalid, not having been made by the stockholders. The right of the stockholders to determine whether they shall assess themselves is a most valuable one, and when it has not been accorded them, they cannot be made liable for an assessment made by anyone else. *Blackert v. Lankford, Commercial Nat. Bank v. Weinhard,* and *Devney v. Harriet State Bank of Minneapolis, supra.*

It is unnecessary to notice a great deal of the argument made by counsel for the stockholders as to the constitutionality of § 34 and as to its meaning, for the

reason that, as we view it, and as we have already stated, § 34 is merely the machinery statute intended to execute § 60, and the contentions that § 34 was not intended to apply to assessments to be made for the replacing of impaired capital or surplus and only refers to delinquent installments upon the original subscriptions may be disposed of by saying that we cannot so read the section, but think it was intended to apply to both situations.

Having arrived at the conclusion, therefore, that the assessment of 1920 was illegally made, the question is presented as to whether the stockholders can now take advantage of that fact, or must be held to have made the payments voluntarily, so that they cannot now complain. They cannot be relieved from the payment of the superadded liability even if the payments were illegally made, nor can they offset these illegal payments against their superadded liability, but the most they are entitled to is to be placed in the category of general creditors and have their claims allowed for the amounts which they had paid under the assessment order if involuntarily paid. To the point that claims against an insolvent bank cannot be set off against superadded liability may be cited a great number of cases, the reasons for the decisions of which is that the two claims are not in the same right, one of them being in favor of creditors against the stockholders, and the other in favor of the stockholders against the bank; and further, that the adoption of any other rule would result in a preference of the stockholders over the other creditors; reference may be made in this connection especially to the cases of *Mosler Safe Co. v. Guardian Trust Co.*, 208 N. Y. 524, 101 N. E. 786, *Golden v. Cervenka*, 278 Ill. 409, 116 N. E. 273, *Williams v. Rose*, 218 Fed. 898, in which latter case it was said:

"Upon the second question, in the absence of a controlling decision by a higher court, my view is that the stockholder is not entitled to set off against an assessment made against him pursuant to the Revised Statutes of the United States, where a bank has become insolvent, the amount of his individual claim against the bank. The reasoning of the Circuit Court of Appeals of the Ninth Circuit in *Wingate v. Orchard*, 75 Fed. 241, 21 C. C. A. 315, covers this branch of the present case. The court there put its decision upon the ground that the fund provided for under the Revised Statutes was not intended for any particular creditor, but to make good all debts equally and without any preference, and that in the event of the winding up of the affairs of a national bank the fund provided by sections 5226 and 5227 was for the express purpose of making good the contracts, debts, and engagements, and is manifestly a trust fund, to a pro rata share of which all creditors are equally and equitably entitled."

See, also, *First Nat. Bank of Winston v. Riggins*, 124 N. C. 534, 32 S. E. 801; *Sawyer v. Hoag*, 84 U. S. (17 Wall.) 610; *Scovill v. Thayer*, 105 U. S. 143.

The case of *Mosler Safe Co. v. Guardian Trust Co.*, *supra*, is distinguished by the fact that the stockholders' payment under the assessment was, as a matter of fact, not used by the bank, but held in a separate fund and was in fact a payment of the superadded liability.

Upon the question whether the payment was voluntary or involuntary, lengthy argument has been made, with the citation of many authorities, some of them holding that it is voluntary, and others that it is involuntary. It is also argued that payments made under mistake of law cannot be recovered. It is true that the old and established idea as to the character of duress and coercion necessary in order to constitute a payment involuntary has been greatly modified and

relaxed by modern authorities. The tendency of the courts has been, and still is—and with that tendency this court has heretofore shown itself in accord (*Olympia Brewing Co. v. State,* 102 Wash. 494, 173 Pac. 430; *Sunset Copper Co. v. Black,* 115 Wash. 132, 196 Pac. 640)—that payments made under what, for lack of a better term, we may call business compulsion are to be held to be involuntary payments; that, where a person is called upon either to suffer a serious business loss or to make a payment, he may recover that payment, when it has been illegally collected, as having been made involuntarily. It is unnecessary to determine absolutely whether the payments here were voluntary or involuntary to arrive at the proper determination of these suits, and we can assume that they were involuntarily made.

But even though these assessments were illegal and were involuntarily made, it does not follow that the stockholders may escape their superadded liability, or recover a judgment which would result in their participation with the creditors as claimants against the insolvent bank. The payments which the stockholders made resulted in the Scandinavian-American Bank continuing to function for a period of over a year thereafter as a bank; additional liabilities were incurred, as the pleadings in these cases show, and, of course, the depositors changed their relationships, relying upon the addition made by these stockholders to the funds of the bank; the bank's customers entered into new obligations, and the status of the business of the corporation was materially affected as a result of these payments. New contracts, debts and engagements accrued. Were the question only between the corporation as such and these stockholders it would be different from the question which is now presented

between these stockholders and the creditors. After having been compelled to make an involuntary and illegal payment, a stockholder, if he had acted promptly, would be allowed to recover the amount of such payment; but after the rights of creditors have been affected, new creditors come into existence, and old creditors have changed their status, it is too late for the stockholders, after the result has proven that the assessments they paid in anticipation of a successful corporate life were unsuccessful, to now assert their rights, and they must be held to be estopped by their conduct from that assertion. Under these circumstances, it is not too rigid a rule to establish that prompt action upon their part was necessary in order to preserve their rights. Although these assessments were paid in March, 1920, it was not until they were sued in November, 1921, that the stockholders claimed these payments of 1920 were made illegally, involuntarily and under duress. The rule is that, in order for a person making such payments to recover, he must disaffirm his action upon the removal of the duress. As was said in *Brown v. Worthington,* 162 Mo. App. 508, 142 S. W. 1082:

"There can be no doubt that a contract made under duress is not absolutely void, but voidable only, and this being true, it is susceptible of ratification so as to render it entirely valid thereafter. Thus, if a person, having been constrained by duress to make a contract, afterward voluntarily acts upon it or in any way affirms its validity, he thereby precludes himself from afterward avoiding it."

In *Bartlett v. Stephens,* 137 Minn. 213, 163 N. W. 288, occurs the following:

"It may be too broad a statement to say that one who has been induced by fraud to acquire stock in a corporation, can in no case be relieved from liability by proceedings taken after the bankruptcy of the con-

cern. The bankruptcy might follow so closely on the heels of the fraud that no amount of diligence could have relieved him before it came. But, if there can be relief from liability in any such case, it is only when there is no laches or estoppel. Although a subscriber becomes a shareholder in consequence of frauds practiced upon him by the corporation, he is nevertheless estopped as against creditors to deny that he is a shareholder, if, at the time the rights of creditors accrued, he voluntarily occupied and was accorded the rights appertaining to that relation. *Scott v. Deweese,* 181 U. S. 202, 21 Sup. Ct. 585, 45 L. ed. 822. And he may lose his right to relief by laches without technical estoppel. A very different rule of diligence is required between him and the creditors, than is required as between him and the corporation. It is his duty to use a high degree of care and diligence to see that creditors are not misled by his conduct.''

This court, in *Walla Walla Fire Ins. Co. v. Spencer,* 52 Wash. 369, 100 Pac. 741, said:

''Dangerous, indeed, would be the doctrine that contracts could be repudiated at will, when entered into by competent and capable men of comprehensive experience and sound judgment. If, in fact, they became the victims of duress, they cannot at the same time ratify, and bide their pleasure to disavow their act.''

See also, *Oregon Pac. R. Co. v. Forrest,* 128 N. Y. 83, 28 N. E. 137, where the court observes:

''As to the second ground upon which the plaintiff bases its action, to wit., that the contract of August thirteenth was invalid because it was procured from it by duress, and that the bonds were coerced from it by a threat on the part of Garrison that he would not deliver to it any of the bonds held by him unless the one hundred bonds were surrendered to him, we have to say: A contract obtained by duress is not ordinarily void but merely voidable, and it may be subsequently ratified and confirmed.''

See, also, *Farmers' State Bank v. Day,* 226 S. W. (Mo. App.) 595; *Deibel v. Jefferson Bank,* 200 Mo.

App. 541, 207 S. W. 869; *Wood v. Kansas City Home Tel. Co.*, 223 Mo. 537, 123 S. W. 6.

The judgment in the instant case was correct and the appellant is liable for the assessment on the super-added liability. Affirmed.

PARKER, C. J., BRIDGES, MAIN, HOLCOMB, TOLMAN, MITCHELL, and HOVEY, JJ., concur.