**CHAPMAN, State Com'r of Insurance and Banking, v. DENTON. (No. ·98.)**

(Court of Civil Appeals of Texas. Waco. Dec. 31, 1924.)

**1. Banks and banking ⬅=67—Acts of directors of consolidated banks without authority of stockholder of retiring bank not binding on him.**

Directors being given power to liquidate affairs of and dissolve retiring bank, viz., collect and pay indebtedness, apportion balance among stockholders, and, if necessary, sell assets for such purposes, but not to barter or exchange assets for stock in continuing bank, with which consolidated, their participation and · acts in latter's directors' meetings, its increase of capital stock and setting aside thereof to stockholders of retiring bank severally, without authority of one of them, were not binding on him.

**2. Evidence ⬅=317(4)—Statements to stockholder of merged bank by directors held hearsay as to continuing bank and banking commissioner.**

Statements by directors to stockholder of retiring bank that stock was to be issued him by bank into which merged after liquidation of retiring bank's assets in amount for which they liquidated *held* narration and construction of past transactions, and hearsay as to continuing bank and banking commissioner, suing such stockholder for amount of personal liability as stockholder of continuing bank under Vernon's Sayles' Ann. Civ. St. 1914, art. 552.

**3. Banks and banking ⬅=67—Stockholder of retiring bank held to have accepted offer of stock in continuing bank in absence of agreement between banks as to liquidation of retiring bank's assets before issuance of new stock.**

Statements by retiring bank's directors to stockholder that stock of bank in which merged would be issued to stockholders of retiring bank in amount for which latter's assets liquidated, *held* admissible, in connection with proxies given by him after consolidation, on issue of ratification, acceptance, or estoppel to deny personal liability for debts of continuing bank, if its agreement to liquidate retiring bank's assets and issue stock to latter's stockholders thereafter were shown, but in absence of such agreement, such stockholder, knowing of proposed consolidation, giving proxies, and being represented in meetings of continuing bank's stockholders must be held to have accepted its offer of stock and become holder of number of shares voted by his representative.

**4. Principal and agent ⬅=177(1)—Agent's knowledge imputed and presumed imparted to principal.**

Knowledge gained by agent in course of and concerning employment, is imputed and presumed to have been imparted to principal.

**5. Banks and banking ⬅=67—Stockholder of retiring bank presumed to have learned of number of shares given him in continuing bank from one holding his proxy at stockholders' meeting.**

Stockholder knowing that retiring bank's assets were in hands of continuing bank, expecting to receive stock in latter, though he did not know how much, and giving proxy to vote "number of shares I may be entitled to," must be presumed to have learned that he was being carried as owner of number of shares allowed his attorney, in absence of agreement between banks to liquidate assets of retiring bank before issuing new stock to its stockholders.

**6. Corporations ⬅=94—Issuance of stock certificate not always prerequisite to becoming stockholder.**

Issuance of stock certificate is not always prerequisite to becoming stockholder, being merely evidence of ownership of interest in corporation.

**7. Corporations ⬅=170 — One may become stockholder by verbal agreement to take shares or course of conduct indicating acceptance of offer thereof.**

One need not have agreed in writing to take shares to become stockholder, but may do so verbally or by course of conduct indicating acceptance of offer of shares.

**8. Banks and banking ⬅=49(9)—Whether stockholder of bank merged in bank subsequently closed by banking commissioner was stockholder in latter bank held fact question.**

Whether stockholder in bank, merged in bank subsequently taken over by banking commissioner, who sued for amount of his personal liability, was stockholder in closed bank, *held* question of fact as to contract or agreement, express or implied, between defendant and such bank.

**9. Evidence ⬅=413—Testimony as to stockholder's knowledge of purposes of stockholders' meeting at time of signing proxy held not inadmissible as contradicting written instrument.**

In banking commissioner's action for amount of stockholder's personal liability for debts of insolvent bank, defendant's testimony on cross-examination as to his knowledge, at time of signing proxy to represent him at stockholders' meeting, that purpose was to dissolve bank in which he held stock and increase capital stock of insolvent bank by taking over retiring bank's assets, and his expectation of receiving stock of equal value in continuing bank, *held* not inadmissible as contradicting written instrument, where proxy not only recited that it was given to vote on liquidation of retiring bank, but authorized representation in transaction of any other business brought before meeting.

---

⬅=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**10. Witnesses ⬅️37(1)—Bank cashier's testimony as to intent and understanding of directors of consolidated banks as to liquidation of merged bank's assets before issuance of new stock to shareholders thereof, held incompetent.**

In banking commissioner's suit to enforce stockholder's personal liability for debts of insolvent bank, testimony of latter's cashier as to general intent and understanding of directors of that and another bank, at time of their consolidation, that no stock of insolvent bank should be issued to retiring bank's stockholders, of which defendant was one, until its assets had been liquidated and money received, *held* incompetent, in view of his testimony that he did not know whether individual stockholders so understood.

**11. Evidence ⬅️317(4)—Testimony of bank's cashier as to general understanding of directors of consolidated banks as to liquidation of retiring bank's assets before issuance of new stock to shareholders thereof, held hearsay.**

In banking commissioner's suit to enforce stockholder's personal liability for debts of insolvent bank, testimony of latter's cashier as to general understanding between directors thereof and those of bank theretofore merged with it, that no stock of continuing bank should be issued until retiring bank's assets were liquidated, *held* inadmissible as hearsay statement of past transactions, not tending to prove alleged agreement between directors and stockholder of retiring bank as to such matter.

**12. Banks and banking ⬅️67—Value of retiring bank's realty, furniture, fixtures, and bills receivable, material only if stockholders were liable for debts of bank taking over assets because property went into merger with his knowledge and consent.**

Proof of value of retiring bank's realty, furniture, fixtures, and bills receivable, or amount actually received from latter, *held* unnecessary in banking commissioner's suit against stockholder thereof to enforce personal liability as stockholder of bank taking over its assets, if defendant were liable for full individual liability of holder of number of shares allotted him, but if liable because property in which interested went into merger with his knowledge and consent, with understanding that he should receive stock therefor according to value, he would be subject to assessment in amount equal to his interest in such assets.

**13. Banks and banking ⬅️49(9)—Finding that depositors in closed bank were not misled into believing that stockholder in bank merged therewith was stockholder of closed bank, held not warranted; "customers."**

Bank cashier's testimony that he told "customers" of arrangement between his bank and bank merged with it that no stock in former should be issued to stockholders of latter until its assets were liquidated, *held* insufficient finding that neither continuing bank nor any "depositor" therein were misled by any act or representation by stockholder of retiring bank, so as to estop him to deny personal liability as

stockholder of continuing bank for its debts, though "customer" is broad enough to include "depositor," all "creditors" not merely depositors, being secured by Vernon's Sayles' Ann. Civ. St. 1914, art. 552.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Customer.]

**14. Banks and banking ⬅️47(1)—Banking commissioner's determination of amount of assessment against stockholders of closed bank conclusive.**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 552, banking commissioner's determination of amount of assessment against stockholders for paying debts of closed bank is conclusive.

**15. Banks and banking ⬅️49(7)—Banking commissioner suing stockholder for debts of insolvent bank need not allege or prove amount and character of latter's indebtedness.**

Banking commissioner suing for amount of personal liability of stockholder for debts of insolvent bank need not allege or prove amount or character of latter's indebtedness; money collected by him, as trustee for creditors, in excess of amount necessary to discharge liabilities reverting to stockholders.

**16. Banks and banking ⬅️49(9)—Conclusion that defendant not estopped to deny personal liability as stockholder of insolvent bank held not supported by finding.**

In banking commissioner's suit for amount of stockholder's personal liability for debts of insolvent bank, finding that neither such bank nor any "depositors" therein were misled by any act or representation by defendant into assuming that he was stockholder by virtue of consolidation of bank, in which he held shares, with closed bank, *held* insufficient to support conclusion that he was not estopped to deny liability, it being his duty to prove affirmatively that no "creditor" was misled to his prejudice.

**17. Banks and banking ⬅️37—Stockholders in retiring bank not entitled to notice of increase of stock by bank taking over its assets.**

Requirements of notice of increase of stock by bank taking over assets of retiring bank is for benefit of then existing stockholders of continuing bank, and not for that of retiring bank stockholders to whom new stock in continuing bank is subsequently issued.

**18. Banks and banking ⬅️37—Copies of documents concerning increase of stock by bank taking over assets of another bank need not be filed in office of secretary of state.**

Under Acts 1917, c. 205, § 1 (Vernon's Ann. Civ. St. Supp. 1918, art. 517g), requiring filing of amendments to bank charters in banking commissioner's office only, copies of documents relating to increase of stock by bank taking over assets of another bank need not be filed in office of secretary of state.

---

⬅️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**19. Banks and banking ⊙⟶70—Stockholders, depositors, and creditors may waive statutory notice of dissolution of bank.**

Notice required by statute, pursuant to dissolution of banking corporation is for benefit of and may be waived by stockholders, depositors, and creditors agreeing on dissolution.

**20. Banks and banking ⊙⟶67—Retiring bank may sell assets to another bank, notwithstanding failure to file copy of dissolution resolution with secretary of state.**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 565, retiring bank, having paid and discharged all indebtedness and liabilities and acted under direction of its stockholders, may sell its assets to another bank, to be paid for in increased stock if reasonably worth price paid, as required by Const. art. 12, § 6, though not legally dissolved because of failure to file copy of resolution to dissolve with secretary of state, and banking commissioner issued certificate of dissolution without authority.

**21. Banks and banking ⊙⟶67—Sale of bank's assets to another bank held not executory.**

Sale of retiring bank's assets to another bank without bill of sale or delivery of furniture and fixtures, nor execution and delivery of deed to realty, *held* not executory, though payment was to be measured and determined by value of assets as ascertained later.

**22. Frauds, statute of ⊙⟶18(1) — Issuance of bank stock to stockholder of merged bank held not void, nor banking commissioner's suit to enforce liability as stockholder in continuing bank defeated, as contrary to statute.**

That no memorandum was made and signed by stockholder of retiring bank to answer for debts or default of bank to which assets were sold, did not render continuing bank's issuance of new stock to him void, nor defeat banking commissioner's action to enforce personal liability as stockholder of continuing bank, as contrary to Vernon's Sayles' Ann. Civ. St. 1914, art. 3965, subd. 2.

**23. Frauds, statute of ⊙⟶49—Contract for sale of bank's assets to another bank for latter's stock held not contrary to statute.**

Contract for sale of bank's assets to another bank to be paid for with stock in latter after liquidation of former's assets, *held* not contrary to Vernon's Sayles' Ann. Civ. St. 1914, art. 3965, subd. 5, as incapable of performance in one year; retiring bank's assets being convertible into money within such time.

Appeal from District Court, McLennan County; James P. Alexander, Judge.

Action by J. L. Chapman, State Commissioner of Insurance and Banking against W. R. Denton. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

Bryan & Maxwell and Weatherby & Rogers, all of Waco, for appellant.

Frazier & Averitte, of Hillsboro, for appellee.

SPIVEY, J. This is a suit by the state commissioner of insurance and banking against appellee to recover of the latter as a stockholder in the First State Bank of Penelope, Tex., the amount of a stockholder's personal liability under article 552 of the Statutes. It is alleged and shown that said bank carried on business until on or about December 13, 1920, at which time it was closed by the commissioner, or his predecessor in office, because it had become and was insolvent and owed debts in a large amount; and that in course of liquidation the commissioner had assessed the stockholders in an amount equal to the par value of their stock and had made demand upon them therefor, it being alleged that defendant was one of said stockholders, holding 10 shares of the par value of $100 each, and that defendant had failed and refused to pay.

Defendant, among other things, pleaded that if said bank ever agreed to issue to him any of its stock, said agreement never became executed by either party before the failure of said bank, and only continued as an executory contract up to date of its failure and going into the hands of the commissioner, when it became unable to perform; that said bank at all times refused to consider defendant as one of its stockholders and refused to issue any stock certificate to him; that he never subscribed for any shares of stock in said bank, and that there never was executed any contract between himself and said bank whereby he became obligated to purchase any amount of its capital stock, nor whereby said bank was bound to issue to him any of its capital stock; wherefore, defendant says that said bank was never authorized to treat him as a stockholder nor did it do so with his knowledge and consent.

It appears that some two years prior to the failure of said First State Bank there was also another bank in the same town, the Guaranty State Bank, capitalized at $20,000; that it went out of business and either merged itself or consolidated itself or sold its assets to said First State Bank; that about the time of this merger the First State Bank increased its capital stock from $15,000 to $35,000; that plaintiff owned 10 shares of the capital stock of the Guaranty State Bank, and that, upon its going out of business, the First State Bank, on taking over the assets of the retiring bank on its books set apart to defendant 10 shares of its new stock, being the same amount that he owned in the retiring bank; and it is alleged by plaintiff that defendant knew of and consented to this increase of capital stock and consolidation or merger, and acquiesced therein and knew of the setting apart of said 10 shares of its stock to him, and that thereafter defendant exercised rights of ownership over it and voted it by proxy in stock-

holders' meetings of the continuing bank, and that he never at any time prior to the insolvency of said continuing bank denied that he was a stockholder in it; wherefore, he was estopped, from denying liability, etc.

Defendant pleaded in reply that he never executed any proxy with knowledge that the facts were true with reference to the consolidation as alleged by plaintiff; that he understood and believed from those handling the matter, who were directors in one or the other of said banks, that the contract calling for said consolidation was executory, and that no stock was to be issued to defendant and none was to be received by him until, from a liquidation of the assets of the retiring bank turned over to the continuing bank, the actual cash value of the assets of the retiring bank should be determined; that if at any time before said liquidation and before said stock was issued he executed any proxy, it was without any knowledge or understanding or belief that he was to be held liable as, or to be considered a stockholder in the continuing bank prior to such liquidation; and that until such time he would only be entitled to representation to such extent as was necessary to safeguard his interest pending such liquidation, and that this was his only purpose in participating in the affairs of the continuing bank, and that he never executed any proxy or authorized any representation with a knowledge and understanding that thereby he was to be considered a stockholder in the continuing bank; and so understanding and believing he acted upon the theory that he was not a stockholder in the continuing bank, and would not be prior to such liquidation, on the happening of which event he would have the right to become a stockholder in the continuing bank in such proportion as his interest in the cash value of the assets of the retiring bank bore to the capital stock of the continuing bank; and that before such condition was brought about the continuing bank became insolvent and became unable to perform its part of the agreement and abandoned and breached the same. He further alleged that the agreement above mentioned was oral between the directors of the two banks and was never carried into the minutes.

There was a trial to the court, who found in favor of the defendant. Judgment was rendered accordingly, and the commissioner has appealed.

Minutes and documents pertaining to each bank, covering the period of time involving the matters in controversy, were introduced in evidence. The following pertinent facts appear from the minutes of Guaranty State Bank: During the latter part of 1918 and early part of 1919 several meetings of the stockholders were held, in which they had under consideration the matter of dissolution and the matter of consolidation with the First State Bank. The stockholders unanimously resolved upon dissolution and ordered their directors to proceed accordingly; and, on January 20, 1919, the board of directors issued their certificate reciting the action of the stockholders, and certifying that all the debts and liabilities of the bank had been satisfied and the remaining assets apportioned among its stockholders, wherefore they formally surrendered its charter and asked that the corporation be dissolved on the records of the secretary of state. This certificate was filed for record in the proper county and certified copy filed with the commissioner of banking on March 15, 1919, and on that date he issued his certificate to the effect that Guaranty State Bank had been legally dissolved.

The following pertinent facts appear from the minutes of First State Bank. On November 30th (presumably 1918) there was a meeting of the board of directors of First State Bank, from the minutes of which it appears that "this board having been approved [approached] as to consolidation of this bank and Guaranty State Bank of Penelope, it was decided after some discussion that this board invite the board of directors of Guaranty State Bank to meet together in joint session and discuss generally matters concerning such consolidation." On December ——, 1918, there was a meeting of the stockholders of First State Bank, in which a motion was adopted unanimously "that this bank increase its capital stock to $35,000 by consolidation with Guaranty State Bank of this place"; and election of officers was deferred "until the consolidation of the two institution be effected." It is also recited that "the following persons, with the sum of stock opposite their names, to be the subscription for the new stock." Then follows a list of names with amount of stock set opposite each, these names and amount of stock corresponding to the list of stockholders of the Guaranty State Bank. On the next day, January 9, 1919, the president and secretary of First State Bank issued their certificate to the effect that at a meeting of the stockholders of said bank, the capital stock had been increased to $35,000, "and that said increase is actually subscribed and paid up in cash," and the directors on the same day made affidavit showing the names, and residences of those who had subscribed for such increase of capital stock, "and that all increase of capital stock had been fully paid up in lawful money of the United States." This affidavit includes a list of names and amount of stock which each is supposed to have subscribed, and these names and amount of stock set opposite each are the same as the stockholders in the Guaranty State Bank. On February 8, 1919, there was a meeting of directors of First State Bank in which it is recited that "the directors of First State Bank met * * * to further

effect the consolidation of First State Bank and Guaranty State Bank." It was agreed that this consolidation be effected at once, and a committee was appointed consisting of two directors of First State Bank to examine the bills receivable of Guaranty State Bank and to effect the consolidation; that a committee of Guaranty State Bank consisting of two named directors of that bank brought the bills receivable of said bank, which were examined by said committee of First State Bank, and it was agreed by said committees that the consolidation be effected at once; and that this plan was accepted by a quorum of the board of directors of Guaranty State Bank, "which was present, being [names five who appear from minutes of Guaranty State Bank to have been such directors], and the cashier of this bank was then instructed to have the papers in the premises filed for record, and to consolidate the books of the two banks at once." *

On March 19, 1919, appellee executed a power of attorney authorizing his attorney "to vote as my proxy at an election of officers of First State Bank of Penelope held March 25, 1919, according to the number of votes I should be entitled to if there personally present." From minutes of a meeting of the stockholders of First State Bank held March 25, 1919, at which 257 shares were represented, and in which appellee was noted as being represented by the attorney mentioned in the proxy, and as having 10 shares, said attorney voted to increase the number of directors, and also voted for the directors for the ensuing year. The above-mentioned certificate and affidavit of the officers and directors of First State Bank were duly filed for record in the proper county and certified copies were filed with the banking commissioner on March 15, 1919, who on that date issued his certificate to the effect that the capital stock of First State Bank had been legally increased from $15,000 to $35,000.

On February 12, 1920, appellee executed another power of attorney to H. Creswell, authorizing the latter "to represent me at any of the meetings of the stockholders of the First State Bank of Penelope * * * and in my name and stead to vote the stock standing in my name on the books of said corporation, and in the transaction of any other business with like authority and effect as I might do if personally present at any such meeting." This proxy was delivered, but there were no minutes introduced showing that it was ever used.

It is to be noted that the stockholders of Guaranty State Bank did not indicate a desire for consolidation, and did not order it; but, rather, this course was negatived when the two plans were under discussion; whereas, the minutes of the directors and of the stockholders of First State Bank indicate that they were considering consolidation.

It was in evidence that the list of stockholders of the retiring bank, who were to be the subscribers for the new stock of the continuing bank, was furnished to the latter by some of the directors of the former.

[1, 2] The power given to the directors of the retiring bank was to liquidate the affairs of the corporation and dissolve it, which meant to collect indebtedness due it, pay outstanding obligations, and apportion to stockholders what remained, if anything; and, if necessary, to sell the assets of the bank for these purposes. The directors recite in their certificate of January 20, 1919, that they had paid and discharged all indebtedness and liabilities, and had disbursed the remainder to stockholders. This substantially illustrates the powers given them. They had no authority to barter or exchange the assets of their bank for stock in the other bank, but could sell for a consideration payable only in money. Morton v. Morris, 27 Tex. Civ. App. 262, 66 S. W. 94, and authorities cited. Hence, their participation in the meetings of directors of the continuing bank and what they did therein were not binding upon appellee. And, likewise, the acts of the continuing bank in increasing its capital stock by consolidation and reciting that the stockholders in the retiring bank were to be the owners of the new stock, and setting it aside to them severally, and certifying their names to the commissioner of banking as the subscribers for the new stock, were not binding upon appellee because he was not a member of that corporation at the time these acts were transpiring, and had not authorized any of them; nor were the minutes of this bank evidencing such acts binding upon him. But such acts showed an intention and an offer that he should become such stockholder in consideration of his interest in the retiring bank; and these acts were followed by the sending of notices to him of stockholders' meetings. So, if appellee became a member of the continuing bank—a stockholder in it —it must have been by acceptance of such offer or acquiescence in the position in which that bank had placed him. He pleaded that his understanding and belief were that no stock was to be issued to him and that he was not to be a stockholder until the assets of the retiring bank had been liquidated into money, and then only for such amount as his interest in such assets when liquidated bore to their face value.

This brings us to a consideration of appellant's bills of exception, taken to evidence offered to prove appellee's contention just stated.

Having testified that there never was delivered to him any stock or certificate of stock of the continuing bank, and that he had never signed any instrument agreeing to accept or pay for any shares in it, ap-

pellee was permitted to testify, over objections of appellant, that he discussed the matter with Mr. Alexander and Mr. Reagor, who were two of the directors in the retiring bank, and had asked them when the two banks were going to consolidate, and Alexander replied that he did not know, "that they had to liquidate things up there," and that when they did liquidate he would know; that Mr. Alexander told him the amount of stock he would get would depend on what the assets liquidated for; that either Mr. Alexander or Mr. Reagor told him that "we were to be issued stock by what the assets liquidated for," and that they had made an agreement for the continuing bank to liquidate the assets of the retiring bank, and that stock was to be issued "to the Guaranty State Bank people after the liquidation took effect." It appears that Alexander and Reagor were two of the directors of the retiring bank and took part in the negotiations between the two banks. They did not testify in the case. It is clear that their statements to appellee were a narration of past transactions, were their construction of them, were hearsay as to appellant and the bank represented by him, and were not binding upon them. Hence, the objections should have been sustained.

[3] However, if upon another trial it should be shown that there was an arrangement or agreement, as stated by Alexander and Reagor, then the above-mentioned statements of these two to appellee would be admissible, in connection with the proxies given by him, as giving character to his acts in connection with the issue of ratification, acceptance or estoppel.

[4, 5] On the other hand, if there was no such agreement, then with what appellee knew as shown by his testimony, coupled with the fact of giving such proxies, and the fact that his representative participated in the meeting of stockholders and voted 10 shares of the continuing bank, it should be held that he accepted the offer of the continuing bank and intended to become and was, in effect, a holder of 10 shares in the continuing bank. Appellee testified that the continuing bank "had the assets" of the retiring bank, and that he expected to receive stock in the continuing bank, but did not know how much. His proxy of March 19, 1919, did not indicate how many shares or votes he was entitled to, but authorized his attorney to vote "according to the number of shares I may be entitled to if personally present." His attorney, under this proxy, was allowed 10 votes as the holder of 10 shares, in the meeting of March 25, 1919, at which there were 257 shares present and voting. The agent became informed of these facts, and the rule of law is that such knowledge as an agent gains in the course of his employment and concerning it is imputed

to the principal, and the agent is presumed to have imparted it to him. Mays v. Bank (Tex. Civ. App.) 233 S. W. 326; Id. (Tex. Com. App.) 247 S. W. 845. Hence, in the absence of previous agreement, such as that hereinbefore mentioned, it must be presumed that on March 25, 1919, appellee learned that he was being carried and was being considered as the owner of 10 shares of the continuing bank, and was authorized to so consider himself. There is no evidence that he ever disaffirmed such position, and the power of attorney of later date is somewhat more definite. It authorized his attorney to represent him at any and all meetings of the stockholders of the continuing bank and in his name and stead "to vote the stock standing in my name on the books of said corporation," etc.

[6, 7] Appellee testified that no certificate of stock was ever issued to him, nor shares of stock; and that he never signed any instrument agreeing to accept or pay for shares in the continuing bank. It is not always necessary that such certificate should be issued as a prerequisite to one becoming a stockholder. It is merely evidence of ownership of an interest in the corporation. Hamilton v. Cushman, 15 Tex. Civ. App. 338, 39 S. W. 641; 26 Am. & Enc. Ency. of Law (2d Ed.) 893, 898; Hughes Mfg. Co. v. Wilcox, 13 Cal. App. 22, 108 P. 871; New Albany & S. Ry. Co. v. McCormick, 10 Ind. 499, 71 Am. Dec. 337. Nor it is necessary that he should have agreed in writing to take shares; he could do so verbally. Somerset Nat. Bank Co. v. Adams (Ky.) 72 S. W. 1125; 14 C. J. 516; 26 Am. & Eng. Ency. of Law (2d Ed.) 895, 898. And, by a course of conduct indicating an acceptance of an offer of shares, he would be bound. Keyser v. Hitz, 133 U. S. 138, 10 S. Ct. 290, 33 L. Ed. 531; 26 Am. & Eng. Ency. of Law (2d Ed.) 896, 904, 1034; Sanger v. Upton, 91 U. S. 56, 23 L. Ed. 220; Philadelphia, etc., Ry. v. Cowell, 28 Pa. 329, 70 Am. Dec. 128.

[8] Appellee was asking Mr. Alexander and Mr. Reagor when the two banks were going to consolidate, and why "they" did not issue him stock. He also testified that he knew the continuing bank "had the assets" of the retiring bank; that he had an interest in the retiring bank; and that when consolidation was effected he knew he had an interest in the other bank; "but that he never knew it was consolidated"; that he expected to get stock in the continuing bank, but did not know how much; that he did not expect to receive any stock in the continuing bank in January, 1919, but that whenever the assets of the retiring bank were liquidated he expected to receive shares in the continuing bank; but that he was told it would be some time; that it was in the fall of 1919 that he expected to get the stock; and that he inquired of Alexander

and Reagor why he did not get it; that he never made any inquiry of any officer of the continuing bank; that Alexander did not tell him he had been allotted 10 shares, nor that he was carried on the books of the new bank for 10 shares.

After all it is a question of contract or agreement between the continuing bank and appellee, either express or implied from the pertinent acts of the two, as to whether he is a stockholder or not. In the case of Union Savings Ass'n v. Seligman, 92 Mo. 635, 15 S. W. 630, 1 Am. St. Rep. 776, it is said that in no case can one be held as a stockholder of a corporation unless the facts are such that he could be held by the corporation itself. In that case the defendants were holders of stock merely as collateral security, and voted at stockholders' meetings. It was held under the facts developed that they were not stockholders in the sense that they could be held liable for the debts of the corporation. We approve the holding. To the same effect is Burgess v. Seligman, 107 U. S. 20, 2 S. Ct. 10, 27 L. Ed. 359. In the instant case we think it is a question of fact whether appellee was a stockholder or not.

[9] On January 6, 1919, appellee executed a proxy to one Mr. Smaystrla, authorizing the latter to vote at any called or stated meeting of the stockholders of the retiring bank "for the purpose of liquidation of the capital stock and the transaction of any other business that may be brought before said meeting." While appellee was testifying appellant proposed to prove by him that at the time of signing said proxy he knew the purpose of the meeting was to dissolve the Guaranty State Bank and to increase the capital stock of the First State Bank by taking over the assets of the former, and that he expected to be issued stock in the latter out of such increased stock, in the same amount as formerly held by him in the retiring bank, and that this was the purpose of the meeting for which he executed the proxy.

Appellee objected to the proposed testimony upon the ground that the proxy spoke for itself, and that it was offered for the purpose of contradicting a written instrument. The objections were sustained. In this we think the court erred. The proxy does recite that it was given for the purpose of voting upon liquidation of the retiring bank; and if this had been the only recital as to the purpose of the meeting, anything different or additional should not have been admitted. But the proxy further authorizes the attorney to represent the principal "in the transaction of any other business that may be brought before said meeting." And if, as was endeavored to be shown by the excluded testimony, appellee knew of any other business contemplated to be brought up, such as that stated in the bill, then the excluded testimony was competent and material upon the issues or what he knew or expected in connection with the transaction going on in both banks.

[10] Over proper objections appellee was permitted to prove by H. Cressell, cashier of the continuing bank during the negotiations and afterwards, that he did not know, as to individual stockholders, that it was understood that when his bank took over the assets of the retiring bank, that it had been discussed and agreed between the directors and stockholders of the two banks that the continuing bank would not issue any stock to the stockholders of the retiring bank until the continuing bank had liquidated and determined the money value of the assets of the former, but that that was the "understanding between the directors that brought on the consolidation." Also, that from the discussions that were carried on in his presence with the directors of the First State Bank, "it was the general understanding that it was a fact that the sense of the directors and the general intentions and understanding of the directors of the First State Bank and of the Guaranty State Bank was that no stock of the First State Bank * * * was to be issued until the assets had been liquidated and the money received." Also, "it is my recollection that each of the directors of the Guaranty State Bank (naming four of them), or any of them, inquired in the directors' meeting of the First State Bank when their stock would be issued, and how much would be issued to them, and it was stated there in the directors' meeting of the First State Bank by ourselves of the directors of the First State Bank that their stock would not be issued until the assets had been liquidated, and then that they were going to get as much stock as they had value in assets, and that is what I told them." Some of the objections, as indicated below, should have been sustained. Minutes of the continuing bank were in evidence, but we do not think they were sufficient to show what the contract was with reference to consideration, in so far as appellee was concerned. Hence, if the proof had been made by some one having personal knowledge of what was said and agreed to in the directors' or stockholders' meeting, in reference to the time of issuance of stock and amount, if anything was said or agreed to, it would have been admissible. But this witness was permitted to testify that he did not know what the individual stockholders knew, and then to state what "the general intention and understanding" of the directors of the two institutions were. The testimony was incompetent and should have been excluded. Leland v. Chamberlin, 56 Tex. Civ. App. 256, 120 S. W. 1040; Bierding v. Wegner, 76 Tex. 506, 13 S. W. 537; Shaller v.

Johnson (Tex. Civ. App.) 189 S. W. 553; H. & T. C. Ry. v. Lee, 104 Tex. 82, 133 S. W. 868.

[11] It was also the statement of a past transaction, and was hearsay, nor did it tend to prove what the previous agreement was, if any. There may have been such an agreement as contended by appellant, and yet the directors could have endeavored to repudiate it, as indicated by the testimony of this witness.

With the foregoing testimony of appellee and that of Mr. Creswell as to the matter of issuance of stock excluded, there is no evidence tending to show the agreement or understanding such as that contended for by appellee. This necessitates the reversal of the judgment.

[12] It appears that the retiring bank owned its building and some town lots and its furniture and fixtures and bills receivable. The record wholly fails to show what became of such real estate and furniture and fixtures, although the real estate was valued by both board of directors at $4,500, and the furniture and fixtures at $2,500. Witnesses speak of the "assets" of the retiring bank having been carried over to the continuing bank, but the word evidently was used in a limited sense and had reference to the bills receivable only. The cashier of the continuing bank testified that there was no way of telling what the bills receivable were worth; but it also appears from his testimony that some of them were collected and that the amount collected could be ascertained from the individual ledger. So, if appellees should be held liable under the commissioner's call for the full individual· liability as a holder of 10 shares, it would not be necessary to prove the value of such real estate, furniture and fixtures and bills receivable, or what was actually received from them. But should he be held liable by reason of the fact that property in which he was interested went into the merger with his knowledge and consent and that both parties intended that he should receive stock therefor according to value, then he would be subject to assessment to an amount equal to his interest in such assets.

[13-15] The cashier of the continuing bank testified that he told "customers" what the arrangement was between the two banks, being as shown by his testimony hereinbefore given. This is the only evidence on the subject. The trial court found and concluded, among other things, that it did not appear that by reason of any act or representation on the part of appellee, the continuing bank or any "depositors" therein did or omitted to do anything to their injury on the assumption that appellee was a stockholder, or that they were misled by any act or representation on his part, and that therefore he was not estopped to deny liability. We think the word "customers" was broad enough to include "depositors," but it is well known that banks have other creditors than depositors, and it is "creditors" who are intended to be secured under the banking act and the individual liability of stockholders. The language of the statute (article 552) is that "if default shall be made in the payment of any debt or liability contracted by any bank * * * each stockholder * * * as long as he owns shares therein, and for 12 months after the date of a transfer thereof, shall be personally liable for all debts of such corporation existing at the date of such transfer, or at the date of such default," etc. And the determination of what shall be the amount of any assessment, under article 552, for the purpose of paying debts is left solely to the commissioner of banking, and his decision is conclusive. Harris v. Briggs (C. C. A.) 264 F. 726; Brooks v. Austin (Tex. Civ. App.) 206 S. W. 723. It was not necessary that appellant should allege or prove the amount or character of the bank's indebtedness. Stringfellow v. Patterson (Tex. Civ. App.) 192 S. W. 555. The banking commissioner is a trustee charged with the execution of a trust in favor of the creditors of an insolvent bank, and should he collect more money than is necessary to discharge liabilities it will revert to the stockholders who paid it in. Collier v. Smith (Tex. Civ. App.) 169 S. W. 1108.

[16] Furthermore, the negative finding by the court does not go far enough when it is borne in mind that all creditors of an insolvent bank have the right to look to the liability of stockholders. The finding should have gone further (had there been evidence to support it, but there was not) and have held that no creditor was misled. Defendant was claiming that he was not estopped to deny liability; hence, upon this phase of the case he should have proven affirmatively that no creditor was misled to his prejudice. It was not the duty of appellant to prove that creditors were not misled, and the absence of such proof would not warrant a judgment for appellee upon this issue.

Appellee contends that no notice of increase of capital stock of the continuing bank was given, wherefore such increase was illegal and the subscription therefor, if any, was not binding; that copies of the documents relating to the increase of stock should have been filed in the office of the secretary of state, instead of in the office of the commissioner of banking; that no notice of the dissolution of the retiring bank was given, wherefore it was never legally dissolved, and that the attempted addition of the stock and assets of that bank to the continuing bank was tantamount to a purchase of the stock of the former by the latter; that the sale by the retiring bank of its assets to the continuing bank was not completed so as to vest title in the latter, under the rule that so long as anything remains to be done in the matter of ascertaining, designating, and separat-

ing the articles from others of like kind, title does not pass; that the attempt to hold appellee liable as a stockholder is in fact an attempt to make him liable for the debts of another without any written obligation signed by him to that effect, and that it was a contract not to be performed in one year. Necessarily these contentions are stated briefly here.

[17-19] No notice of increase of stock by the continuing bank was given, but we think the requirement of such notice was for the benefit of then existing stockholders and could not avail appellee. The Act of April 9, 1917 (article 517g of 1918 Supplement to Vernon's Statutes), requires that amendments to bank charters shall be filed in the office of the commissioner of insurance and banking and that it shall not be necessary to file same in the office of the Secretary of State. This statute was in force at the time of the transactions herein and was complied with. The notice required by statute to be given pursuant to the dissolution of a banking corporation we think is for the benefit of its stockholders, depositors, and creditors. In this case all stockholders legally waived such notice and agreed upon dissolution; and the certificate of its officers recites that all its debts and liabilities had been discharged. We know of no creditor or stockholder who is complaining of lack of notice; and appellee as a stockholder joined in the agreement to waive notice and to dissolve the corporation.

[20] It is true that the statute still requires a copy of the resolution to dissolve a bank to be filed with the secretary of state, and that this was not done in this case, but was filed with the commissioner of banking instead, and he issued his certificate to the effect that said bank had been legally dissolved. We do not find any statute authorizing him to issue such certificate, but we do not understand that the continuing bank purchased the stock of the retiring bank, but rather that it purchased its assets and, according to one theory of the case, intended and expected to pay for them in its own stock. Article 505 of the Statutes recognizes the right of one bank to purchase the assets of another, and requires the latter to increase its capital stock for this purpose. The statute does not provide how these assets shall be paid for, and we know of no reason why they may not be paid for in such increased stock, provided the assets are reasonably worth the price paid, as required by the Constitution, art. 12, § 6. So, if the retiring bank should now be held not to have legally dissolved (upon which we do not pass), it still had the right and power, having paid and discharged all indebtedness and liabilities and acted under the direction of all its stockholders, to sell its assets.

[21] The objection that the sale was not complete, but remained executory, we do not think is available. The sale was of the retired bank's "assets," which would mean real estate, personal property, and choses in action. The bills receivable were actually delivered. The furniture and fixtures needed no bill of sale to transfer the title to them; whether they were delivered or not the record does not disclose. Ordinarily, a deed was necessary to pass title to the real estate; whether this was executed and delivered the record does not disclose. Under one phase of the transaction, according to the pleadings, payment was to be measured and determined by certain facts to be ascertained later. This did not render the sale executory. Cleveland v. Williams, 29 Tex. 204, 212, 94 Am. Dec. 274.

[22, 23] Nor can the contention be sustained that the transaction, and now seeking to hold appellee liable, are contrary to the statute of frauds. Article 3965, subdivisions 2 and 5, in that no memorandum was made and signed by appellee to answer for the debts or default of another, and in that it was a contract not to be performed in one year. It has been frequently held that one may become the owner of shares in a corporation without any written subscription or signed agreement therefor, and that a certificate of stock, which is generally not signed by the owner, is evidence of title. Under subdivision 5 of said article it is contracts which are not to be performed in one year that are made unenforceable. In the instant case we know of no reason or facts why the assets of the retiring bank could not have been converted into money within one year.

What has been said herein we think disposes of appellant's assignments without the necessity of discussing them seriatim. For the errors pointed out, the judgment is reversed and the cause remanded.